IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERICH SCHERFEN and RUBINA TAREEN    :
             Plaintiffs    :
                 :
    v.    :    3:CV-08-1554
                 :    (JUDGE VANASKIE)
UNITED STATES DEPARTMENT OF    :
HOMELAND SECURITY, et al.,    :
          Defendants    :

## MEMORANDUM

A party seeking only a declaratory judgment and prospective injunctive relief in federal court, as have the Plaintiffs in this action, must present a claim for which meaningful relief may be granted, i.e., standing, and the asserted claims must fall within the federal court's authority as delimited by the United States Constitution and congressional enactments, i.e., subject matter jurisdiction. The absence of either standing or subject matter jurisdiction compels dismissal of such an action. In this case, Plaintiffs satisfy neither standing nor subject matter jurisdiction. Accordingly, Defendants' challenge to this Court's authority to entertain this action will be sustained.

I. BACKGROUND

Plaintiffs, citizens of the United States, contend that they have been placed on "watch lists and in the Terrorist Screening Data Base" compiled by the United States Government solely "because they are Muslim and have been active in promoting their faith."

(Comp., Dkt. 1, at ¶ 69.)[1]  Plaintiffs also contend that they have been "falsely stigmatized as individuals associated with terrorist activity" without being afforded "a legal mechanism that affords them notice and an opportunity to contest their inclusion on the terrorist watch lists." (Id. at ¶ 73, ¶ 74.)  Plaintiffs seek a declaratory judgment as well as injunctive relief in the form of "removal of Plaintiffs from any watch lists or databases that inhibit their travel in any manner."  (Id., p. 21.)

Plaintiff Erich Scherfen is an American-born United States citizen and a combat veteran of the first Gulf War who resides in Schuylkill County, Pennsylvania.  Mr. Scherfen obtained employment as a commercial pilot in May of 2007.  Plaintiff Rubina Tareen is a naturalized citizen of the United States who emigrated from Pakistan in 1974.  Ms. Tareen is engaged in the business of selling books about Islam through a website and at conferences. Mr. Scherfen and Ms. Tareen are husband and wife.

Both Mr. Scherfen and Ms. Tareen are active members of the Islamic community, attend Islamic prayer services every week, and speak publicly regarding comparative religion and Islam.  Both Plaintiffs allege that, commencing in September of 2006, they were

---

[1] For the convenience of the reader of this Memorandum opinion in electronic format, hyperlinks to the Court's record and to authority cited herein have been inserted.  The Court accepts no responsibility for, and does not endorse, any product, organization, or content at any hyperlinked site, or at any site to which that site might be linked.  The Court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

subjected to enhanced screening prior to boarding flights at airports within the United States.[2]  Both Plaintiffs allege that they have been informed by airlines and airport personnel that they are on terrorist watch lists maintained by the United States Government.

Plaintiffs also describe an incident that occurred on December 25, 2006, when they were returning home by car from Toronto, Canada, and were stopped and interrogated by agents of the Department of Homeland Security (DHS) for several hours.  During this incident, the contents of their vehicle, including boxes of books that Ms. Tareen had offered for sale at an Islamic conference in Toronto, were searched.  A letter Mr. Scherfen wrote to DHS complaining about the December 25, 2006 incident went unanswered.   (Id. at ¶ 39.)

Mr. Scherfen alleges that on April 29, 2008, his employer informed him that he was "a 'positive match' on a TSA 'list.'" (Id. at ¶ 54.)  By this time, Mr. Scherfen had been employed as a commercial airline pilot for almost one year, evidently without encountering any problems.  Mr. Scherfen's employer placed him on administrative leave and required the surrender of his pilot identification card.  On May 19, 2008, Mr. Scherfen was suspended without pay and informed that he would be terminated if he was unable to resolve his placement on a watch list.

_____

[2] Mr. Scherfen alleges that on January 10, 2002, while at Fort Rucker, Alabama, he was questioned by two FBI agents who had been told that he might have information about the September 11, 2001 terrorist attacks and also questioned him about conversations with his neighbor, an Egyptian officer.  (Comp., Dkt. 1, ¶ 35.)

Earlier in May of 2008, Mr. Scherfen wrote to the DHS "Traveler Redress Inquiry Program" (TRIP), requesting that his name be removed from the "list" as promptly as possible. (May 5, 2008 Letter, Ex. "A" to Comp., Dkt. 2.) Mr. Scherfen's letter stated:

> I cannot begin to imagine why I am on this list and I can only believe there must be some mistake. I have served our country honorably as an officer and am proud of the values on which it is based. I am a Veteran of the 1991 Gulf War, serving as an enlisted infantry man, a paratrooper, and as an officer/helicopter pilot in the National Guard. I joined the United States Army in August 1989 and have served in the military for a total of thirteen years. Honorably discharged on 9 February 2006.

(Id.)

By letter dated June 17, 2008, Mr. Jim Kennedy of the DHS TRIP responded to Mr. Scherfen's inquiry. (Ex. "B" to Comp., Dkt. 3.) While explaining that DHS "can neither confirm nor deny whether an individual is on a federal watch list because this information is derived from classified and sensitive law enforcement and intelligence information," Mr. Kennedy's letter informed Mr. Scherfen of the process by which "individuals who believe they have been incorrectly delayed, denied boarding, identified for additional screening, or have experienced difficulties when seeking entry into the United States," may seek redress. (Id.) The June 17, 2008 letter further provided:

> [DHS] requires airlines to verify the identity of all passengers to insure that persons on Federal watch lists who are known to pose, or are suspected of posing, a threat to civil aviation or national security receive secondary screening or are denied boarding on commercial aircraft. The Federal watch lists are maintained by the U.S. Terrorist Screening Center in a consolidated Terrorist Screening Database, and are compiled from information provided by

4

the Federal intelligence and law enforcement agencies. The Federal watch lists include a No-Fly List and a Selectee List. Individuals on the No-Fly List are prohibited from traveling on commercial aircraft. Individuals on the Selectee List are permitted to fly but receive secondary screening at airport security checkpoints.

(Id.) Mr. Kennedy advised Mr. Scherfen that he could invoke the TRIP process either by completing a "Traveler Inquiry Form" online or by completing a written form and sending it to DHS. Mr. Scherfen was further informed that a control number would be assigned when an online inquiry was submitted. Finally, Mr. Scherfen was told that he would receive a written response to the Traveler Inquiry Form upon completion of review.

On June 17, 2008, both Plaintiffs submitted Traveler Inquiry Forms in hard copy. On his form, Mr. Scherfen checked the boxes for the following scenarios that purported to describe his travel experience:

[A]lways subjected to additional screening when going through an airport security check point.

[U]nable to print a boarding pass at the airport kiosk or at home.

[D]irected to the ticket counter every time I fly.

[A]irline ticket agent states that I am on a Federal Government Watch List.

[D]etained during my travel experience.

[T]icket agent took my identification and 'called someone' before handing me a boarding pass.

[R]epeatedly referred for secondary screening when clearing U.S. Customs and Border Protection.

5

(Ex. C to Comp., Dkt. 4.)  On her Traveler Inquiry Form, Ms. Tareen, in addition to the boxes for the above-mentioned scenarios, checked the box for the scenario of having missed a flight while attempting to obtain a boarding pass.  (Id.)  Both Plaintiffs checked the box to indicate that they believed that they had been discriminated against based on race, disability, religion, gender, or ethnicity.  (Id.)

On August 19, 2008, not having received any response to their Traveler Inquiry Forms or even a control number by which to track the processing of the forms despite a follow-up inquiry by their counsel, Plaintiffs commenced this litigation.  Accompanying the complaint was an "expedited" motion for emergency injunctive relief due to the impending termination of Mr. Scherfen's employment.  (Dkt. 5.)  By Order dated August 21, 2008, a hearing on the preliminary injunction motion was scheduled for September 18, 2008.  (Dkt. 14.)

By letter dated August 26, 2008, addressed to the Office of Chief Counsel of the Transportation Security Administration (TSA), an attorney for Mr. Scherfen's employer confirmed that Mr. Scherfen was being returned to flight status.  (Dkt. 17-2.)  In light of this development, Plaintiffs withdrew their motion for a preliminary injunction. (Dkt. 18.)

By separate letters dated October 15, 2008, Mr. Kennedy of TRIP provided his agency's response to Plaintiffs' separate Traveler Inquiry Forms.  Mr. Kennedy's letters are identical in content, stating in part:

In response to your inquiry concerning travel delays at the airline ticket counter or airport security checkpoint, we conducted a review of any applicable records in consultation with other Federal agencies, as appropriate. Where it was determined that a correction to records was warranted, these records were modified to address any delay or denial of boarding that you may have experienced as a result of the Transportation Security Administration's watch list screening process. This determination constitutes our final agency decision, which is reviewable by the United States Court of Appeals under 49 U.S.C. § 46110.

* * *

Although we can neither confirm nor deny that DHS has records or information that prompted this inspection, if DHS has determined, based on your correspondence that there is a need to make changes or corrections to any such record or information, should it exist, I can assure you such changes or corrections have been made.

(Ex. 8 and Ex. 25 to Def. Mot. to Dism. or in Alt. Summ. J., Dkt. 42.)

On December 12, 2008, within sixty (60) days of receipt of the October 15, 2008 TRIP determination letters, Plaintiffs filed with the United States Court of Appeals for the Third Circuit a Petition for Review, invoking the jurisdiction established by 49 U.S.C. § 46110. The Petition for Review presented claims virtually identical to those asserted in this action. Plaintiffs thereafter moved for a stay of consideration of their Petition for Review pending the outcome of this litigation.

On January 2, 2009, Defendants moved in this Court for a stay of litigation or, in the alternative, for an extension of time, pending the Third Circuit's decision on Plaintiff's request for a stay of the appellate court proceedings. (Dkt. 33.) A telephone conference was conducted on the motion to stay this litigation, following which this Court issued an

Order denying the requested stay of litigation and establishing the deadline for the submission of a motion to dismiss and supporting brief. (Dkt. 39.)

Defendants' timely filed motion presents three discrete arguments for dismissal of this litigation: (1) Plaintiffs lack standing because they cannot show a real or immediate threat of injury sufficient to support prospective injunctive relief; (2) exclusive jurisdiction over Plaintiffs' claims is vested in the Court of Appeals by virtue of 49 U.S.C. § 46110(a); and (3) Plaintiffs' claims are, in any event, without merit. With respect to the standing issue, Defendants offered to submit for ex parte, in camera review "further information." (Brief in Supp. of Mot. to Dismiss, Dkt. 42-2, at 29 n.6.)

Following completion of briefing, oral argument on the dispositive motion was held on June 18, 2009. During the course of the oral argument, counsel for Plaintiffs indicated that there was no objection to the ex parte, in camera review of the information to which reference was made in Defendants' supporting memorandum of law. (Tr. of 6/18/09 oral argument, Dkt. 71, at 2-3.) On July 8, 2009, Defendants submitted information that they claimed provided additional support for their standing challenge.

On July 20, 2009, Plaintiffs presented documentation that constituted the partial response of the United States Immigration and Customs Enforcement ("ICE") to a Freedom of Information Act ("FOIA") request for materials pertaining to Ms. Tareen. Plaintiffs asserted that the documentation suggested that Ms. Tareen remained on a government

watch list so that the difficulties she had encountered while traveling within and outside the United States would continue. Defendants responded to this submission by letter dated July 27, 2009, arguing that the document accompanying the July 20, 2009 letter did not suffice to establish an imminent, concrete injury sufficient to sustain standing. Defendants offered to present for in camera, ex parte review, an unredacted version of the two-page document that accompanied Plaintiffs' counsel's letter. On August 12, 2009, Defendants submitted an unredacted copy of the document that had been presented by Plaintiffs' counsel.

On October 16, 2009, the Court of Appeals for the Third Circuit granted Plaintiffs' motion to stay the parallel appellate court proceedings pending the outcome of this litigation. This Court was apprised of this development by letter from Plaintiffs' counsel dated November 3, 2009.

II. DISCUSSION

A. The Statutory and Regulatory Framework

Central to this litigation is the contention that Plaintiffs' names appear on "terrorist watch lists." Named as Defendants are various components of the federal government that play some role in the compilation and dissemination of such lists to appropriate personnel at airports and border crossing points. Specifically, named as Defendants are DHS; the Federal Bureau of Investigation (FBI); TSA; ICE; the U.S. Customs and Border Protection

("CBP"); the Terrorist Screening Center (TSC); the Department of Justice (DOJ); and the National Counterterrorism Center (NCTC).

Defendant TSC is responsible for compiling the Terrorist Screening Database ("TSDB"), the federal government's consolidated terrorist watch list. The TSC was established as a result of Homeland Security Presidential Directive-6, which was issued on September 16, 2003. (Homeland Security Presidential Directive 6, http://www.dhs.gov/xabout/laws/gc_1214594853475.shtm (last visited Feb. 1, 2010).) The proclaimed intent of this presidential directive is to establish an organization that would "consolidate the Government's approach to terrorism screening and provide for the appropriate and lawful use of Terrorist Information in screening processes." (Id.) The TSC is administered by the FBI with support from other federal agencies, including DHS and DOJ.

The TSDB includes a "No Fly List," identifying individuals who are not permitted to board flights for travel by air, and a "Selectee List," identifying persons who are to be subjected to heightened screening prior to being allowed to board a flight for travel by air. TSDB information is also provided to the CBP, another component of DHS, for inclusion in its computerized inspection and boarder crossing system, known as the Treasury Enforcement Communication System, or TECS. 73 Fed. Reg. 77778-77779.

Defendant TSA has the statutory duty to establish procedures for notifying "airline

security officers of the identity of individuals known to pose, or suspected of posing, a risk of . . . terrorism or a threat to airline or passenger safety." 49 U.S.C. § 114(h)(2). TSA has implemented this statutory directive through "Security Directives" that require specific security measures with respect to persons identified on the No Fly List or the Selectee List. Compliance with the TSA Security Directives is mandatory. See 49 C.F.R. § 1544.305(a).

Pursuant to 6 U.S.C. § 114, the TSA Security Directives are classified as "Sensitive Security Information." See 49 C.F.R. § 1520.5(b)(2) & (9). Pursuant to 49 C.F.R. § 1544.305(f), aircraft operators receiving a Security Directive must restrict its availability to persons with an operational need to know. Because the government has classified the TSDB and its components as "sensitive but unclassified," the agencies and persons involved in the creation of the TSDB will neither confirm nor deny whether an individual is on a particular list or in the TSDB. (Comp., Dkt. 1, at ¶ 18.)

Congress has required that DHS "establish a timely and fair process for individuals who believe they have been delayed or prohibited from boarding a commercial aircraft because they were wrongly identified as a threat under the regimes utilized by [TSA], [CBP] or any other office or component of [DHS]." 49 U.S.C. § 44926(a). This legislation specifically directed DHS to establish "an Office of Appeals and Redress to implement, coordinate, and execute" a process by which persons erroneously listed as a threat may obtain relief. See 49 U.S.C. § 44926(b)(1). The office is to include representatives of TSA,

CBP, and other components of DHS as deemed appropriate by the Secretary of DHS.

The process established by DHS to carry out the legislative directive in 49 U.S.C. § 44926(a) is TRIP.  As described on the DHS website, TRIP is:

[A] central gateway to address:

! Watch list misidentification issues.
! Situations where travelers believe they have faced screening problems at ports of entry.
! Situations where travelers believe they have been unfairly or incorrectly delayed, denied boarding or identified for additional screening at our Nation's transportation hubs

(DHS Traveler Redress Inquiry Program (DHS TRIP),

http://www.dhs.gov/files/programs/gc_1169676919316.shtm (last visited Feb. 1, 2010)).

TRIP is intended for persons "who have been repeatedly identified for additional screening . . . to have erroneous information corrected in DHS systems."  (Id.)

Judicial review of orders pertaining to security duties and powers designated to be carried out by the TSA is governed by 49 U.S.C. § 46110(a).  Specifically, Congress has directed that parties "disclosing a substantial interest" in such orders of TSA may file a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the Court of Appeals of the United States for the circuit in which the person resides or has its principal place of business.  49 U.S.C. § 46110(a).[3]  Congress has further prescribed

_____

[3] Section 46110(a) covers orders "issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers

12

that the Courts of Appeals have "<u>exclusive</u> jurisdiction to affirm, amend, modify, or set aside" any part of an order that falls within the security duties and powers set forth in 49 U.S.C. § 114(l), 49 U.S.C. § 114(s), or 49 U.S.C. §§ 40101-46507. <u>See</u> 49 U.S.C. § 46110(c) (emphasis added).

It has been recognized that the TSA Security Directives that concern screening of passengers constitute orders falling within section 46110(a). <u>See</u>, <u>e.g.</u>, <u>Gilmore v. Gonzales</u>, 435 F.3d 1125, 1133 (9th Cir. 2006). Defendants contend that Plaintiffs are challenging orders of the TSA that similarly fall within section 46110(a). Plaintiffs, emphasizing that the source of their grievance is not TSA Security Directives that fall within § 46110(a), but instead is the TSDB complied by the TSC, argue that this case does not fall within § 46110. Defendants assert that, to the extent that Plaintiffs focus on their presumed inclusion in the TSDB and not on whether enhanced screening is unconstitutional <u>per se</u>, Plaintiffs do not present the requisite real and immediate threat of injury necessary to sustain standing. This jurisdictional argument will be assessed first.

B. <u>Standing</u>

The judicial power of the federal courts extends only to actual "Cases" and

_____

designated to be carried out by the Under Secretary. . .) in whole or in part under [49 U.S.C. §§ 40101 - 46507] or subsection (l) or (s) of [49 U.S.C. § 114] . . . ." As explained in <u>Ibrahim v. DHS</u>, No. C-06-00545, 2009 WL 2246194, at *1 (N.D. Cal. July 27, 2009), the Under Secretary of Transportation for Security is the head of TSA. Pursuant to 6 U.S.C. § 203(2), TSA became an agency under DHS.

"Controversies." See U.S. Const., Art. III, § 2; DeJohn v. Temple Univ., 537 F.3d 301, 308 (3d Cir. 2008). "[A]n 'essential and unchanging part' of Article III's case-or-controversy requirement, and a key factor in dividing the power of government between the courts and the two political branches," is the requirement of standing. Vermont Agency of Natural Res. v. United States ex rel. Stevens, 529 U.S. 765, 771 (2000). There are three components of Article III standing: first,"injury in fact," meaning "a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" Id. Second, a causal relationship between the actual or imminent injury and the challenged conduct of the defendant. Id. And finally, "redressability," meaning that there is "a 'substantial likelihood that the requested relief will remedy the alleged injury in fact." Id.

Because a finding of standing "often turns on the nature and source of the claim asserted," Raines v. Byrd, 521 U.S. 811, 818 (1997), the standing inquiry must focus on the specific allegations proffered by the plaintiff and the precise relief sought. See Common Cause of Pennsylvania v. Pennsylvania, 558 F.3d 249, 262 (3d Cir. 2009). In this case, the alleged injury pertains to the intensive screening and difficulties encountered by Plaintiffs when attempting to travel by air or cross the border into the United States. The alleged cause for the asserted injuries is their purported inclusion in the TSDB and its component

No Fly List and Selectee List.[4]  The redress sought by Plaintiffs is removal from the TSDB.

Heightened screening at airports and border-crossing points does not necessarily signify inclusion in the TSDB.  Travelers may be pulled out of line, searched, and questioned for a variety of reasons, unrelated to watch lists.  Thus, the averment of intensified screening does not suffice to show a causal relationship between the alleged injury and the challenged conduct, or show that the alleged injury can be prevented by the requested injunctive relief – removal from the TSDB.

Plaintiffs, however, have alleged more: they claim to have been told that they are on some watch list and the intense screening they have experienced has been routine.  The complaint thus supports a fair inference that Plaintiffs have experienced intensified screening as a result of inclusion in the TSDB, indicating that the alleged harm could be avoided by the requested injunctive relief.

The reinstatement of Mr. Scherfen's flight status by his employer and the conclusion of the TRIP process, however, raise substantial questions as to whether meaningful injunctive relief remains available in this case.  The voluntary withdrawal of the motion for preliminary injunctive relief was plainly an acknowledgment that intercession by this Court to protect Mr. Scherfen's employment was no longer necessary.  Immediate injunctive relief to

---

[4] Because Plaintiffs have not alleged that they were precluded from flying or entering the United States, it appears that their alleged injury is attributable to their purported inclusion on the Selectee List.

guard against a future hypothetical interference with employment would not have been appropriate. In this regard, "past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." O'Shea v. Littleton, 414 U.S. 488, 495-96 (1974). Thus, Plaintiffs' allegations of enhanced screening and other difficulties encountered while in transit and Mr. Scherfen's suspension of employment that occurred before this case was brought are not sufficient, in and of themselves, to show that there remains a current threat of sufficient reality and immediacy to sustain this litigation. See City of Los Angeles v. Lyons, 461 U.S. 95, 102-03 (1983). Instead, Plaintiffs must be able to show a present or imminent threat of enhanced screening and/or suspension of employment that is "fairly traceable" to inclusion on the TSDB such that a favorable decision in this matter is likely to prevent the harm of which they complain. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).

Defendants argue that the reinstatement of Mr. Scherfen's flight status and the issuance of the TRIP determination letters after this litigation was initiated preclude Plaintiffs from showing the existence of an immediate and real threat of injury capable of being prevented by the prospective injunctive relief sought by Plaintiffs. Stated otherwise, if Plaintiffs are not in the TSDB, any enhanced screening that either Plaintiff may encounter could not be said to be fairly traceable to the alleged wrongful conduct, and the alleged

injury would not be avoided by the requested injunctive relief, i.e., removal from the TSDB.[5]

One possible scenario revealed by the documents submitted for in camera review is that neither Plaintiff was ever on the TSDB.  In that event, Plaintiffs would lack standing because they would be unable to show that the alleged threatened injury (enhanced screening and difficulties in traveling) is attributable to discriminatory placement on the TSDB.  Nor could they sustain a procedural due process claim because this Court could not provide any effective relief.  This Court could not order establishment of a review process to preclude the possibility of future listing.  In this regard, "[i]n cases where a plaintiff seeks injunctive or declaratory relief only . . ., standing will not lie if 'adjudication . . . rests upon contingent future events that may not occur as anticipated or indeed may not occur at all.'" Pryor v.  Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 561-62 (3d Cir. 2002).

The second possible scenario is that Plaintiffs were on the TSDB at one time, but have since been removed from that list.  As in the first scenario, this Court would be unable

---

[5] Because the TSDB status of Plaintiffs can neither be confirmed nor denied, this Court cannot discuss in this opinion the contents of the documents submitted for in camera review following the oral argument held in June of 2009.  Upon the request of either party, however, this Court will prepare a separate opinion that sets forth the contents of the documents and explains more directly why Plaintiffs do not have standing.  This opinion, however, will be unavailable for inspection by the public or by Plaintiffs or their counsel.  Instead, this Court will follow the procedure utilized in Rahman v. Chertoff, No. 05 C 3761, 2008 WL 4534407, at *11 (N.D. Ill. Apr. 16, 2008), by directing that the separate opinion be held in the custody of the Court Security Office of the Litigation Security Section of the Department of Justice so that it will be available in the event that further review is sought by any party.

to grant effective relief if Plaintiffs are not presently included in the TSDB.  Article III of the Constitution, of course, "requires that there be a live case or controversy at the time that a federal court decides the case, and not only when the litigation is initiated." Burke v. Barnes, 479 U.S. 361, 363 (1987); Hall v. Beals, 396 U.S. 45, 48 (1969).  The adjudicatory power of a federal court depends upon "the continuing existence of a live and acute controversy." Steffel v. Thompson, 415 U.S. 452, 459 (1974) (emphasis in original). Removal of Plaintiffs from the TSDB would deprive this Court of the requisite "live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law." Hall, 396 U.S. at 48.

Plaintiffs, citing DeJohn v. Temple University, 537 F.3d 301 (3d Cir. 2008), argue that removal from the TSDB would merely amount to the voluntary cessation of actionable conduct that does not render a claim moot.  The issue here, however,  is not whether a claim has become moot, but whether plaintiffs can satisfy "the preconditions for asserting an injunctive claim in a federal forum." Lyons, 461 U.S. at 105.  As in Lyons, the cessation of the alleged wrongful conduct, i.e., the purported placement on the TSDB, would render speculative any claim that Plaintiffs will again experience the kind of injury attributable to the alleged wrongful conduct that animates this litigation.

Furthermore, if Plaintiffs have been removed from the TSDB, no effective relief could be granted by this Court.  Plaintiffs do not claim an entitlement to a blanket exemption from

18

the TSDB regardless of future conduct or activities. Nor could this Court grant such a

blanket exemption.[6]

Even if the second hypothetical scenario – removal of Plaintiffs from the TSDB – is

analyzed under the mootness doctrine, Plaintiffs cannot maintain this action. "The court's

ability to grant effective relief lies at the heart of the mootness doctrine." DeJohn, 537 F.3d

at 308. If Plaintiffs are not in the TSDB, there is no meaningful relief that could be granted.

In this regard, this case is not at all like DeJohn, where the defendant continued to

vigorously defend the validity of a policy that it had revised after the commencement of

litigation. 537 F.3d at 308-10. Because Temple University had continued to defend the

validity of its original policy, our Court of Appeals found that a judicial determination of the

constitutionality of the policy remained appropriate. Id. at 310. By way of contrast,

Defendants in this case do not defend an alleged policy to place on the TSDB all persons

who are active participants of the Muslim religion. Instead, Defendants assert that there is a

meaningful program to rectify erroneous inclusion in the TSDB, and refer to the TRIP

determination letters issued in the case as corroboration for their assertion.

The ad hoc resolution of a party's grievance through a review process does indeed

demonstrate that there is no reasonable expectation that the alleged wrongful conduct will

_____

[6] Plaintiffs may, of course, be subject to enhanced screening on an ad hoc basis for
reasons unrelated to TSDB listing.

recur.  In this case, Plaintiffs claimed they were included in the TSDB solely because they are active members of the Muslim faith.  If as a result of their initiation of the TRIP review process Plaintiffs have been removed from the TSDB, it necessarily follows that a determination has been made that their active participation in the Islamic faith does not warrant inclusion in the TSDB and that there are no other circumstances existing at the time the TRIP determination letters were issued that warranted their listing.

Plaintiffs have not alleged that they continue to suffer the effects of the alleged discriminatory inclusion in the TSDB such that this Court could still grant meaningful relief if they no longer appear in that database and associated watch lists.  Accordingly, Plaintiffs cannot show a legally cognizable interest in adjudicating whether they at one time appeared in the TSDB and, if so, why they had been so designated.

In summary, review of the documents submitted for in camera review compels the conclusion that Plaintiffs lack standing to maintain this action for prospective injunctive and declaratory relief.  Even if Plaintiffs have standing, however, dismissal is necessary because Plaintiffs' claims fall within the exclusive jurisdiction of the Court of Appeals conferred by 49 U.S.C. § 46110(a).

C.  Subject Matter Jurisdiction

Defendants argue that this matter belongs in the Court of Appeals, and not in this Court, because the TRIP determination letters constitute "orders" falling within the ambit of

49 U.S.C. § 46110.  Defendants also argue that, even if the TRIP determination letters do not constitute such "orders," they are nonetheless inescapably intertwined with orders that fall within the exclusive jurisdiction of the Court of Appeals.  Finally, Defendants assert that the No Fly and Selectee lists are inescapably intertwined with orders falling within 49 U.S.C. § 46110.

Plaintiffs counter by arguing that the TRIP determination letters do not constitute orders.  They also contend that the TRIP determination letters are irrelevant because they were issued after the commencement of this litigation.  Relying upon the divided panel opinion in Ibrahim v. DHS, 538 F.3d 1250 (9th Cir. 2008), Plaintiffs assert that the question of placement on No Fly and Selectee Lists does not fall within the matters over which Courts of Appeals have exclusive jurisdiction by virtue of § 46110.

Plaintiffs' reliance upon the majority opinion in Ibrahim is misplaced.  Significantly, Ibrahim did not involve a determination made by DHS following receipt of a Traveler Inquiry Form from the affected person.  Thus, Ibrahim did not present for consideration the issue of whether a TRIP determination letter constitutes an order falling within § 46110.  Instead, Ibrahim focused solely on the question of whether placement on the No Fly List fell within § 46110.

Plaintiffs argue that the TRIP determination letters should not be considered here because they were issued following the commencement of this action.  But Plaintiffs

initiated the TRIP process prior to bringing this lawsuit. Moreover, Plaintiffs assail the sufficiency of the process provided. Under these circumstances, it is appropriate to consider the TRIP determination letters for purposes of determining whether this Court has subject matter jurisdiction. In this regard, there is no dispute that Plaintiffs received the TRIP determination letters. Courts, of course, may consider matters outside the complaint when addressing a Rule 12(b)(1) motion addressing subject matter jurisdiction.[7] See Green v. Transp. Sec. Admin., 351 F.Supp. 2d 1119, 1123 (W.D. Wash. 2005).

One of the reasons that the majority in Ibrahim found that the placement of a person on the No Fly List fell outside the scope of § 46110 was the absence of any administrative record to review. Where, however, the TRIP process has been invoked, there is indeed a record for review by the appellate court. In this regard, the TRIP determination letters issued in this matter state that "any applicable records" have been reviewed. Accordingly, the Court of Appeals could require submission of the records reviewed in the TRIP determination process.[8]

Plaintiffs argue that the TRIP determination letters do not constitute "orders," arguing that they do not represent "a definitive statement of the agency's position with concrete

---

[7]At oral argument, Plaintiff's counsel acknowledged that this Court could consider the October 15, 2008 TRIP determination letters in addressing the challenge to its subject matter jurisdiction. (Tr. of 6/17/09 Oral Argument at 26.)

[8] If no records are produced, then Defendants would be hard pressed to defend their decision.

legal consequences." (Brief in Opp. to Mt. to Dis., Dkt. 48, at 25 (quoting Aerosource, Inc. v. Slater, 142 F.3d 572, 578 (3d Cir. 1998))).) Plaintiffs' position is based upon the fact that the determination letters explicitly state that DHS can neither confirm nor deny Plaintiffs' status insofar as the TSDB is concerned.

That security reasons preclude confirmation of a person's status fails to signify that the TRIP determination letters do not represent a definitive resolution of the matter. The determination letters in question specifically state that they constitute final agency action on the issue. The letters assure Plaintiffs that appropriate action, if required, has been taken. As indicated by Defendants, the TRIP determination letters mean either that Plaintiffs are on the No Fly or Selectee List, and thus subject to travel restrictions and/or enhanced screening with consequent travel delays, or not included on the No Fly or Selectee List. In either event, the letters reflect the fact that a final determination has been made that "'fixes some legal relationship.'" Aerosource, 142 F.3d at 577.

Finally, the existence of TRIP determination letters in this case means that, unlike Ibrahim, there are orders issued by an agency named with § 46110. In Ibrahim, the majority concluded that because the No Fly List is compiled by the TSC, which is part of the FBI, placement on the No Fly List "was an 'order' of an agency not named in Section 46110. . . ."

538 F.3d at 1255.[9]  Here, by way of contrast, TRIP was established under 49 U.S.C. §

44926, a statute encompassed by the jurisdictional grant conferred by § 46110 over

security-related orders issued pursuant to statutory authority established in 49 U.S.C. §§

40101 through 46507.  The letters plainly deal with "security duties and powers designated

to be carried out by [TSA]."  49 U.S.C. § 46110(a).  Thus, the letters are orders of an

agency identified in section 46110(a).  Accordingly, Plaintiffs properly invoked the exclusive

jurisdiction of the Third Circuit when they petitioned for review of the TRIP determination

letters in December of 2008, and this Court lacks the authority to proceed in this matter.

    Even if the TRIP determination letters do not constitute orders falling with the

purview of § 46110, jurisdiction in this matter is foreclosed because placement on No Fly or

Selectee Lists is inescapably intertwined with orders of the TSA that indisputably fall within

§ 46110.  As noted above, operational effect to the No Fly and Selectee Lists is provided by

Security Directives issued by TSA.  In other words, inclusion on a list has no practical

significance in the absence of the Security Directives.  Plaintiffs do not dispute the fact that

Security Directives are orders within the reach of § 46110.  Indeed, the Ninth Circuit in

Gilmore, 435 F.3d at 1133, held that Security Directives constitute orders within § 46110.

---

    [9] It is significant that the Ibrahim majority found that inclusion on a No Fly List
constituted an "order."  538 F.3d at 1255.  If inclusion on a watch list is an order, then it
necessarily follows that a decision to either remove or not remove a person from such a list
is an order as well.

The majority in <u>Ibrahim</u> summarily dismissed the argument that the No Fly List, even if an order of an agency not identified in § 46110, was inescapably intertwined with such an agency's orders and therefore still reviewable under § 46110. The majority reasoned that because § 46110 does not mention "intertwining,' escapable or otherwise," appellate court review is restricted to "orders" issued by the agencies identified in § 46110. 538 F.3d at 1255.

The holding in <u>Ibrahim</u> is inconsistent with the well-settled proposition that a jurisdictional grant such as conferred by § 46110 is "not to be given a narrow, technical reading; instead it is to be interpreted expansively." San Diego Air Sports Ctr., Inc. v. Fed. Aviation Admin., 887 F.2d 966, 968 (9th Cir. 1989). An expansive construction is appropriate because "the purposes of special review statutes – coherence and economy – are best served if courts of appeal exercise their exclusive jurisdiction over final agency actions." Id. Consistent with this view, a number of Courts of Appeals have held that district courts are precluded from hearing matters that are "inescapably intertwined" with orders falling within statutory provisions such as § 46110. See, e.g., Doe v. F.A.A., 432 F.3d 1259, 1263 (11th Cir. 2005); Merritt v. Shuttle, Inc., 245 F.3d 182, 187 (2d Cir. 2001); Dresser v. Ingolia, 307 F. App'x 834, 842-43 (5th Cir. 2009). Accordingly, it is appropriate to consider the relationship between the government watch lists and TSA Security Directives.

TSA Security Directives cannot be given operational effect without the watch lists embodied in the TSDB, and the TSDB is meaningless unless it is given operational effect. Such an interrelationship plainly satisfies the "inescapably intertwined" test. As explained by the dissenting opinion in Ibrahim:

> Congress squarely delegated the responsibility for promulgating regulations and directives relating to the No Fly List to the Transportation Security Administration in 49 U.S.C. §§ 114(h)(3) and 44903(j). Specifically, § 44903(j)(2)(E)(iii) provides that 'the Secretary of Homeland Security, in consultation with the Terrorist Screening Center, shall design and review, as necessary, guidelines, policy and operating procedures for the collection, removal and updating of data maintained, or to be maintained, in the no fly and automatic selectee lists. Id. § 44903(j)(2)(E)(iii). Additionally, the [TSA] is charged with using information developed by other government agencies to 'identify individuals on passenger lists who may be a threat to civil aviation or national security' and 'if such an individual is identified, notify appropriate law enforcement agencies, prevent the individual from boarding an aircraft, or take other appropriate action with respect to that individual.' Id. § 114(h)(3).
>
> ***
>
> Even if the statutory framework did not clearly establish that Ibrahim's claims against the Terrorist Screening Center constitute challenges to an order of the Transportation Security Administration and are therefore subject to § 46110(a), the district court would still lack jurisdiction because Ibrahim's claims against the Terrorist Screening Center are "inescapably intertwined" with the claims that are unquestionably subject to that statute.

538 F.3d at 1259-60.

The screening lists are effectively parts of the Security Directives, which are "orders" subject to review under section 46110. The fact that redress for those claiming to be erroneously included on such lists is through DHS, and not TSC, underscores the fact that

the lists are "inescapably intertwined" with orders falling within the purview of § 46110.

Both the District Judge and Circuit Judge N. Randy Smith in Ibrahim found that the matter of placement on a No Fly List is within the exclusive jurisdiction of the Courts of Appeals. Two other district courts also came to the same conclusion. See Tooley v. Bush, No. 06-306, 2006 WL 3783142, at *26 (D.D.C. 2006), aff'd on other grounds, 586 F.3d 1006 (D.C. Cir. 2009); Green, 351 F. Supp. 2d at 1124-26. I find the reasoning of the District Judge and Circuit Judge Smith in Ibrahim and the District Judges in Tooley and Green to be persuasive. Inclusion on a watch list derived from the TSDB is "inescapably intertwined" with orders falling within the purview of § 46110. Accordingly, assuming arguendo that Plaintiffs remain on the No Fly or Selectee Lists of the TSDB following issuance of the TRIP determination letters, and that those letters do not constitute orders within the purview of § 46110, this Court nonetheless lacks the authority to adjudicate Plaintiffs' claims because the TSDB and associated lists are inescapably intertwined with orders that can be reviewed only in the Court of Appeals.

## III. CONCLUSION

For the reasons set forth in the foregoing Memorandum, Defendants' jurisdictional challenge to this litigation will be sustained.[10]  An appropriate Order follows.

s/ Thomas I. Vanaskie
Thomas I. Vanaskie
United States District Judge

---

[10] Because Plaintiffs have already invoked the jurisdiction of the Court of Appeals for the Third Circuit, the appropriate result in this matter is dismissal of the action, as opposed to its transfer to the Court of Appeals.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ERICH SCHERFEN and RUBINA TAREEN     :
              Plaintiffs     :
                               :
     v.     :     3:CV-08-1554
                               :     (JUDGE VANASKIE)
UNITED STATES DEPARTMENT OF     :
HOMELAND SECURITY, et al.,     :
              Defendants     :

ORDER

NOW, THIS 2nd DAY OF FEBRUARY, 2010, for the reasons set forth in the

foregoing Memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss pursuant to Rule 12(b)(1) of the Federal Rules of

Civil Procedure (Dkt. 42) is GRANTED.

2. The Clerk of Court is directed to mark this matter CLOSED.


                         s/ Thomas I. Vanaskie
                         Thomas I. Vanaskie
                         United States District Judge